You may proceed, if you would like to. May it please the Court, Julie Hadden for the appellate in this matter, RJB Wholesale, Inc. I would like to reserve five minutes of my time for rebuttal. I'd like to start by focusing on the District Court's order granting summary judgment in favor of the defendant, Castleberry, who is the respondent in this case. The District Court erred in granting summary judgment in favor of the defendant in this case. In the underlying case, RJB brought claims against the respondent for, among others, violations of the Washington State Uniform Trade Secrets Act, the Computer Fraud and Abuse Act, and the Economic Espionage Act. There is evidence in the record that supports every single one of the elements of all of these claims. What are the material questions of fact that, in your view, should have precluded the entry of summary judgment? Well, I think there are several. Tell us what they are. First of all, the first aspect of the Court's order that is clearly in error is the Court's determination that RJB's information, its customer list, and its outlook context, and its pricing information, is, as a matter of law, does not constitute a trade secret. There is case law on point, Ed Nagrowski v. Rucker, where the Washington Supreme Court held that the determination of whether case-specific information is a trade secret is a question of fact.  The customer list is a compilation made over 46 years. The customer list contains over 1,500 entries. It lists customers across 28 states and two countries. Where would you look to find this information? The other side cites several cases for the proposition that this information that's on the customer list is readily ascertainable. Mr. Castleberry did not have a contract of employment, correct? He did not have a non-compete agreement. Correct. Did he have a contract of employment? He was an Atwill employee. I would agree there. Did he have a contract of employment? No, he did not. And he was not required to sign a confidentiality agreement, correct? Not a confidentiality agreement. He did sign an acknowledgment of receipt of the handbook, which explained what confidential information is. That handbook is in the record. That acknowledgment is also in the record. It explained the lengths that RJB expected Mr. Castleberry and all of its employees to go to in protecting its confidential information. There is also case law that says that handbook is enough to satisfy an element related to a trade secret, the third prong of the test that set out in the – Taking appropriate action to protect. Correct. That doesn't seem to be an issue here, actually. But you have this list. It comes up in virtually every case where you have an employee who leaves one job, works in the same industry. But if you scroll through and look at how many of these were already Napsteel customers, a number that have never been there, there's no suggestion he contacted those people, aren't you really left with just a couple of contacts that are at issue? And that gets to my real question, which is, what's the causation or connection between this claimed customer list and any claimed damages? So those are two different – we're talking, one, about whether or not the customer list is the trade secret, and then whether or not we have appropriate facts to support the element of damages. Correct. Right. Suppose Mr. Castleberry – Let her answer those questions first. Yeah, I'm sorry. Go ahead. Then we'll give you another one. So the – even if you boil it down to just a few contacts, there is evidence in the record that creates an issue of fact there. What's the issue of fact? Well, the issue of fact is that there is at least one customer, that there is evidence in the record that Mr. Castleberry used the Outlook contacts that he downloaded off of his RJB phone after his employment ended to reach out to that customer and to solicit sales, more than just an announcement of, hey, I've moved jobs. And the damages are? Well, and the damage – so this is where the district court erred again in applying the wrong standard. I know. I'm asking you what is the damage. I don't want to know. We're on de novo review. Right. So you don't even have to worry about the district court. Tell us what is the damage. What is the damage? Well, there are two cases. No, what is the damage? I don't want to know about case law. Where do I look in the record to find the damage? The damage is in the sale of the sale to the Exhibit U customer. So in the record, you find the customer list at ER-777, and then you find the name and email address of Exhibit U's purchasing agent that was taken from an RJB phone at ER-1329 in the Outlook contacts. And you see that Mr. Castleberry emailed that address to announce his move to NAP and then to solicit a sale. And that's at ER-1332. You'll find an email exchange with that customer U where he's soliciting a sale. Was there a consummated sale? Yes, there was. Okay. And how much is the damage claimed by RJB? Well, that is where we don't need to specify an amount of damages. In the sales records, there's an almost $25,000 sale that was made as a result of this reach-out and this contact. Okay. But in terms of the standard for the application of the standard for what meets the element of a claim for damages, this is where the district court applied the wrong standard. The case law, Petters, and then relied on later in a supplemental authority that I submitted in a 28J letter, ADA Motors case, the burden to make an appropriate claim for damages is on the plaintiff to show that these misappropriated trade secrets were used to solicit a sale and that the sale, in fact, happened. And then it's very clear that the law is that the burden shifts to the defendant to show that a portion of that specific sale was not attributable to the use of that trade secret, and that is very clear. And there's no case law cited in the briefing of the respondent that would refuse that. Mr. Castleberry was a sales representative both when he was with RJB and in his current employment. I take it it's his current employment. He certainly knew who he came in contact with. The absence of a confidentiality agreement suggests to me he was perfectly free to contact these people and tell them, hey, I've changed jobs. I'm now working for this other company, and if I can ever be of service, I'd be happy to do so, right? And there's more than that in the record. There's more than that is, hey, we have great pricing. We can sell to you, the customer. You was a sale customer. He had that puffing about his new job, and he really likes the place where he's working now. But there was nothing to prevent him from doing that, and that puts aside just for the moment the use of the phone and the use of the contact information that was in there. But these were customers that he had physical contact with, correct? That he had physical contact in which job? When he was with RJB. Some of them. Yeah. So the Exhibit U customer is one that was on the 2011 customer list from RJB. Is that correct? Correct, and that customer had not worked with Knapp Steel since 1998, and the evidence that that was a sale customer and that the current contact information that was taken from the RJB Outlook contacts was used to call that customer, and then he needed to submit a new. It had been so long he had to submit a new credit application to do business with Knapp Steel. I have a question. Before RJB brought the underlying lawsuit, did he consult your firm? My firm? Did he consult a law firm? Yes. And which law firm was that? That was the law firm of Inslee Best that submitted the briefing. That's not my law firm. Okay, and they were the ones that signed the complaint? That's correct. And advised RJB that they should bring a claim under these various statutes? Well, I wasn't party to that conversation. I think that is an attorney-client communication. But they signed the complaint. Assume that they did advise that they were appropriate claims. Did they sign the complaint? Yes. And when did your firm take over the case? My firm got involved about three months ago. After the trial? There was no trial, Your Honor. After the summary judgment was entered? That's correct. Okay. So your firm had nothing to do with the decision to institute litigation under the various statutory claims, correct? That's correct. Okay. That's all I wanted to know. Thank you. That's an easy one. Other than the borough's declaration, what's the evidence on what work the plaintiff did to maintain both the outlook and the other customer list as confidential trade secret? Other than the borough's declaration, what's the evidence on that?  that RJB did in order to maintain the secrecy of its customer list? Right. Well, that's where the handbook comes in. There are provisions in the handbook, which is in the record, that Mr. Castleberry acknowledged receiving, that discuss in detail Mr. Castleberry's duty as an employee of RJB to keep certain information confidential. And that would include any confidential information or trade secrets. And there is case law that says that those efforts, through the employee handbook, even absent a specific confidentiality agreement or agreement not to compete or in a specific employment contract, are sufficient to maintain the secrecy of that. Doesn't Mr. Castleberry claim all of that, all of the customers' publicly available information? I believe that he does. And I would argue that that is a question of fact. If you look in detail at that customer list, which is also in the record, you'll see over 1,500 names, not just distributors, but also those direct customers across 28 states. But, again, other than the borough's declaration, what's the evidence on that? I think it would be Mr. Beck's declaration. Or is it Beck? Mr. Beck, the RJB. Okay. Borough's is the other side. Okay. Well, there's no evidence that they – well, let me put it this way. The only evidence to the contrary that the respondent has submitted to refute that, and in a summary judgment, all inferences have to be taken in favor of the non-moving party, are these declarations of Mr. Castleberry and Mr. Borough's that just say this information is widely known in the industry. Do you want to save your remaining time? Yes, I do, Your Honor. Thank you. Thank you. Good morning. May it please the Court, Karen Jones appearing on behalf of the appellee, Jeff Castleberry. As the district court correctly recognized, this case involves RJB's attempt to improperly prevent Mr. Castleberry from continuing to work in the steel pipe industry in circumstances where no non-compete agreement and no non-solicitation agreement exist. As we've been discussing today already, the heart of RJB's case is its UTSA and EEA claims against Mr. Castleberry, and those claims fail on three different fronts because RJB has failed to meet three essential elements of those claims, the existence of a trade secret, misappropriation, and damages. And in the interest of time, I'll just touch on a couple of those today. Talk about what we do know. Your client did take a cell phone that belonged to RJB with him, correct? He did, although, correct, he did. And never returned it? It was never requested to be returned by RJB. And never returned it? He never returned it. That's correct. And that cell phone contained information about RJB's customers, correct? It contained his outlet contacts just as anybody's phone would, including his personal and business ones that he had entered in there. It contained information about RJB's customers, correct? Correct. Some customers contact email and phone numbers. What is your evidence that the underlying litigation was brought in bad faith? Well, as the court focused on below, one is the complete lack of trade secret information that was allegedly taken and then a complete lack of damages. Who made the decision that the customer list constituted a trade secret for the purpose of instituting litigation? Who made the decision that it was? Was it an official of RJB or was it lawyers? I would not know the answer to that. The lawyer signed the complaint, correct? That's correct. Do you have any information that RJB knew or its officials knew that this customer list did not amount to a trade secret when the litigation was ensued? As a matter of law, I do not have evidence because I was not party to the conversations. But the reality is, look, in all of these cases where you don't have a non-compete, which you could have in Washington where you don't have a non-compete, and somebody takes compiled information as opposed to simply going out and contacting a prior customer, isn't there at least a foundation that that information is trade secret in its compiled form? Because that doesn't mean, you know, nobody said here, well, you could kind of work backward from every company in the industry who might buy this stuff and then you could come up with the same thing. But I don't see how it's in bad faith when a guy walks out the door, puts it on his telephone, downloads it. Now, to its credit, the new company says, hey, we don't want you to use that. But what's in bad faith about, given Washington law on confidential customer lists, that makes that somehow a violation? Well, I guess a couple points. One, if you look at this list, it's just so bare bones compared to anything you see in the case law that hold that a compilation could constitute a trade secret. Here, it really is just a list of 1,500 or so companies, the cities in which they're located, not even street addresses, phone numbers which are on the Internet, and then an already outdated indication of when the last sale had been made. So let's take Exhibit U because going through everything, that's what has been identified is that there was potentially a customer that was on the compiled list that Mr. Castleberry contacted and made a completed sale. And I'd appreciate hearing your comments on that. Yeah, absolutely. Well, as Council acknowledged here today, and it has been acknowledged in the briefing, a customer, U, was a preexisting customer of Napsteel. And I think why that's critical. It's not a recent one. Not a recent one. So they keep saying it's not a current customer, it was a stale customer. But the reality is when you're looking at what information is at stake here, what the alleged confidential information is, it's the identity of that company and publicly available basic phone number that could be found on the Internet. So that was something Napsteel obviously already had as to this particular customer. Regardless of how long ago that sale had been made, this was the company they were aware of, and there's no indication that Mr. Castleberry somehow provided secret information that led to that sale. So they haven't pointed to any sales that are linked to the actual alleged trade secret information, which is what the district court recognized below as well. At the end of the day, Judge Peckham concluded that they hadn't proved compensable damages. Correct. That's correct, Your Honor. And that's sort of the heart of the summary judgment, isn't it? I would agree, yes. That and the lack of a trade secret, I think, are the two points that Judge Peckham really focused upon. And even if it was a trade secret, you still need the remaining causation and damages, correct? That's absolutely correct, yes. I would like to ask you one thing, which I didn't have a chance to ask Ms. Haddon, and that has to do under the CAFA claim. They say there were damages for investigation. Do you know of anywhere in the record that documents those damages? I'm very glad you brought that up, Your Honor. That's the point I wanted to make today because in preparing for the argument, I realized that, to my knowledge, I could not find anything in the record indicating actual evidence that they had expended $5,000 or more on investigation costs. It's a bare allegation in the briefing with no citation to testimony or evidence to that effect. So there's nothing in the record that would support that or not. I couldn't find anything, but I'm open to finding it. I could not find anything either. Yes, thank you, Your Honor. And I guess to that point, too, on the CAFA claim, even if they had somehow had something in the record, their investigation or alleged investigation was into the desktop that Mr. Castleberry had left at RJB, not into the cell phone, which has been sort of the focus, their new focus of that CAFA claim. And so any alleged damages? You could argue that the desktop was used for the downloading, correct? Well, so both of the forensic experts in this case have acknowledged there's no evidence linking the cell phone, like a OneDrive account to any email account or linking the phone to the actual computer back at RJB. It's more a matter of the phone syncing to the email server because he had his... When he downloaded it, did he download from his phone to his computer at the new company? So are you talking about the customer list, Your Honor? Yes. Okay. He had emailed it to his personal email address while he was still employed with RJB, and so it was sitting there. He never actually printed it or anything like that. It was sitting there on his email, to my understanding. So that's the format it took. Counsel for RJB brought up the burden of proof on damages, and I'd just like to briefly touch on that. And I think we're both in agreement that the Petters case applies here, but we're reading it differently. So RJB would have us stop the analysis at the point of just demonstrating that Napsteel made sales to certain customers and then says that that should be it, that proves their damages. But, in fact, their burden is to show that revenue was obtained through the transfer of a trade secret. And, again, that's a showing they've not made here. So prior to the time when the defendant would have any obligation to show that a particular sale was not linked, was not an actual loss to the plaintiff, the plaintiff bears the burden of showing that that sale was, in fact, due to a trade secret. And that's where RJB fails here. As to the attorneys' fees issue, counsel didn't have an opportunity to get into that as much, but in the briefing, RJB has put a lot of emphasis on the correct test to establish bad faith. And so I wanted to address that as well. Counsel is reading the Precision v. Rivera case to be a definitive bad faith test that the Washington District Court should have applied. Again, it does not establish that type of case. It says that, in that instance, it cannot be said the plaintiff was fully aware that his suit was essentially frivolous given that there's no other evidence of bad faith on the plaintiff's behalf. The court finds that an award of fees in the case is not appropriate. So it's really looking at the circumstances of that case and also indicating there are various ways in which bad faith could be found. So in this instance, Judge Peckman's application of a test that other courts have cited with approval as guidance for her analysis was entirely appropriate. Did she do that because your statute doesn't define bad faith? That's correct. It does not. And so she was looking for a method to analyze it and chose a very reasonable one that other courts have adopted as well. And I think, actually, it could be argued that the application of the Gemini test is actually a higher threshold to show bad faith than what RJB would be applying because it has two prongs, not just that the claims are baseless but also that there's a finding of improper motive or purpose, the second prong. And so the court really was taking a hard look at the circumstances. Improper purpose here. The improper purpose. Well, the court below found that there was... Describe what the improper purpose was. Fill in the blank. The improper purpose was trying to essentially squelch competition where there is no non-compete agreement and preclude Mr. Castleberry from continuing to pursue his livelihood in the industry due to personal animus. Why did they try to do that? I mean, that's where... That's every case where somebody walks out of a company and they compete in the same industry and they had this customer list that he downloaded. A lot of times they don't even know that they downloaded it. So why wouldn't that be a reasonable basis to bring a suit given his conduct? Well, and here we have an added layer where there was the friendship between the two that went awry and Mr. Beck had personal animus against Mr. Castleberry beyond what you would typically see in sort of an arm's length. Where does it say that that's bad faith if you have a legitimate legal argument? Well, that's why there's the two prongs to the test, Your Honor, I would argue. The first prong being the claims are baseless and the second prong being the improper purpose. Trouble saying they're baseless. It took me a long time to sort out what it might and might not be. I didn't see evidence either way about how long it might take to compile such a list and to put together such a list. Is there anything in the record about that? About how long it would take to compile it? Well, of course, RJB is saying we added names to this list over the course of many years of their business. But let's first answer my question. Is there anything in the record that shows you from either side how long it would take to compile such a list? I don't believe so, Your Honor. I'm not... Because my difficulty with this is in all these cases, of course, you say, well, I'm in the steel industry. It's no secret who's in the steel industry in the world. All I do is I go on the Internet and I figure it out and I write down the names and towns and stuff. But if you compile that, do you acknowledge that under some circumstances a customer listing, even without pricing information, could be considered a trade secret? I think under certain circumstances it could, but I don't think those circumstances are met here. It really is just such a bare-bones list. It would just be a matter of adding a company to the list every time you make a sale. There's nothing in it that isn't publicly available. Mr. Casselberry could have. Why does he need the list, then? Why does he need the list? He can just go out, but he did. Well, he emailed it to himself because of tracking commissions. That's in the record. He was not emailing it to himself to take to Knapsteel or anybody else. He was trying to mark off which customers he believed commissions had been diverted. And do we know how he landed on customer reflected in Exhibit U? How he landed on that customer? I believe it was somebody he had worked with while he was at RJB. I don't think that's in dispute. Some of these customers are overlapping customers between RJB and Knapsteel. But again, he had no non-compete agreement, and he had an established relationship with them. Ms. Jones, what's wrong with this? Casselberry fails to show that the lawsuit was motivated by a vendetta. Beck's disappointment over the resignation of a valued employee is understandable. Beck became much more concerned, as any employer would, when he discovered evidence that Casselberry lied about his plans, took the customer list, and started contacting RJB customers for a competitor. What's bad faith about bringing a lawsuit? The reason you have discovery is to figure out the damages. I mean, doesn't he have a facially valid claim at this point? For one thing, there are some facts that are not supported in the record, like Mr. Casselberry lying about whether he was going to go elsewhere. The same email they rely on in the record for that actually has Mr. Casselberry telling Mr. Beck, I've contacted other steel pipe companies. So he's very upfront about where he was going. But to also address your question, even if at the very beginning of the case there wasn't bad faith, and I believe there was, but even if that weren't the case, as the case progressed and discovery progressed, as the court in its order on the motion to compel said, I have not seen any evidence of damages a year and a half into the case, and it seems to be pure speculation. So the court itself was saying that. At some point, Mr. Beck should have come to that conclusion, that this was, in fact, baseless, and he should not have maintained the case, which is another sign of bad faith. It may be that at some point it became, you need to give up the ship, but the district court basically gave you the whole nine yards, right? The district court did. Yes, the district court found there was bad faith from the beginning. All right. Correct. Thank you. All right, thank you. Ms. Haddon, I gave you a little advance notice of a question I was going to ask you about CAFA, is where do I look in the record to see investigation costs linked to the computer as opposed to the cell phone? Good question. I'm glad you repeated it because my notes are so messed up here I might not have gotten back to that. So evidence record, page 742, on the declaration of Richard Burson, links there and declares that more than $5,000 was spent in order to investigate the RJB computer. That's all we have? The evidence in the record, yes, page 742 in the evidence record. I wanted to make one other correction. I said that when your Honor asked me what damages they suffered as a result of the sales to customer U, I said $25,000. That's the ultimate sale that Knapp Steel made to customer U, but there is a page 1011 of the briefing, Castleberry actually made $5,000 in sales as a result of that specific contact. Ultimately it was $25,000. So I wanted to make a couple more comments. I think your Honor was right on the right track in discussing the customer list as a compilation. That is one of the very essential elements of a trade secret is that it be a compilation. It was that in this case. It's not just any compilation, but is there any evidence in the record here? I think your colleague said she didn't know of anybody where somebody actually said, well, here is how much it would cost to recreate this, to make a compilation such as you have here. That's right, and I would argue that it can't be done. This is something that was put together. It can't be done? That it probably could not be done. That's a pretty audacious argument, but nobody put forth any evidence about that, right? You didn't say, you don't have an executive who says, look, by doing it over this many years, if we had to recreate this, we either couldn't recreate it or it would take this much time or whatever. Is there any such evidence along those lines? Well, not the kind that you are talking about now, but I think if you look at the list, you see the different nuances to it, the fact that it covers 28 states, was compiled over 48 years, and the other thing that I would also argue is that we have sort of omitted and for Castleberry definitely omitted talking about the specific nature of the Outlook contacts that were downloaded from the cell phone to a new cell phone. Those Outlook contacts contain the names and the specific phone numbers of specific people who were decision makers within those particular contacts. So although the customer list may have been more bare bones, as counsel described it, the Outlook contacts were not. They actually had information, and that information is what led Mr. Castleberry to customer you. And I would just say that in an overarching manner, counsel kept referring to the claims as having no evidence to support. So I would emphasize that here, all inferences have to be made in favor of the non-moving party. That's RJB, and all of these, including the credibility issues that counsel briefly spoke about, they are questions of fact, and those are for a jury to decide. Certainly one of the fundamental importances of our judicial system is to allow credibility to be assessed by your peers. So the judge, in making that determination, was incorrect in granting summary judgment. Thank you. Thank you. Thank you for the argument this morning. RJB Wholesale v. Castleberry is submitted. McReynolds v. Saul is submitted on the briefs.
judges: Hawkins, McKeown, Harpool